UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KIMBERLY HOFFMAN and | § | |
| PATTI PATE-SCHNURE, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:12-CV-3806-B |
| | § | |
| AMERICAHOMEKEY, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

<u>MEMORANDUM ORDER AND OPINION</u>

Before the Court are (1) Plaintiffs Kimberly Hoffman and Patti Pate-Schnure's ("Plaintiffs")
Motion for Summary Judgment Against AmericaHomeKey, Inc. ("AHKI") and Lane Terrell (doc.
167), (2) Plaintiffs' Motion for Summary Judgment Against Weststar Mortgage Corporation
("Weststar") (doc. 169), and (3) Weststar's Motion for Summary Judgment Against Plaintiffs (doc.
164), all filed on April 1, 2014. For the reasons that follow, the Court **GRANTS in part** and
**DENIES in part** Plaintiffs' Motion for Summary Judgment Against AHKI and Lane Terrell (doc.
167), **DENIES** Plaintiffs' Motion for Summary Judgment Against Weststar (doc. 169), and **DENIES**
Weststar's Motion for Summary Judgment Against Plaintiffs (doc. 164).

## I.

## BACKGROUND

This cases arises out of a dispute over certain bonuses that Defendant AHKI allegedly owed,
but failed to pay, Plaintiffs Kimberly Hoffman and Patti Pate-Schnure, and the subsequent sale of

AHKI's assets to Defendant Weststar. The salient facts of this dispute are set forth below.[1]

A.      *AHKI's Loan Origination Business*

AHKI was a financial institution that made loans to consumers who wanted to buy houses. Doc. 166, Weststar App. 33 (47:23–25). AHKI made its profits by originating or purchasing mortgage loans and then selling those mortgage loans to buyers in the secondary market. *Id.* In order to originate a mortgage loan, AHKI would take an advance against one or more lines of credit that AHKI had with certain "warehouse lenders." *Id.* at 34–35 (71:24–25, 72:1–4). Once the loan monies were disbursed to the consumer, AHKI would immediately sell the loan to the warehouse lender and pay back the advance, keeping any leftover funds as profit. *Id.*

From the time of its inception in 2000 through its sale to Weststar in January 2012, AHKI maintained relationships with multiple warehouse lenders, including GMAC Mortgage and Countrywide/Bank of America.[2] *Id.* at 35–36 (72:20–22, 78:15–19). From 2005 until 2011, however, AHKI's primary warehouse lender was Countrywide/Bank of America, which at one point in time funded seventy to eighty percent of the home loans originated by AHKI. *Id.* at 36–38 (78:15–19, 79:23–25, 80:1).

B.      *Plaintiffs' Employment with AHKI*

Plaintiffs Hoffman and Pate-Schnure began working for AHKI in early 2009, when they were hired as Senior Vice Presidents responsible for managing AHKI's branches in Alabama, Georgia, and North Carolina (the "Southeast Branches"). Docs. 171, Pls. App. 7, 23, 35; 191, AHKI App. 85, 97.

---

[1] The Court takes its factual account from the uncontested facts contained in the summary judgment record. Any contested fact is identified as the allegation of a particular party.

[2] Countrywide was purchased by Bank of America in 2008.

Under the terms of their employment contracts (together, the "Employment Contracts"), Plaintiffs each received a base salary of $480,000 a year and were also eligible to receive a monthly profitability bonus "equal to fifty percent (50%) of the net, pre-tax profits of the Southeast Branches." Pls. App. 23, 35, 163–64 (106:21–23, 107:6–8); AHKI App. 85, 97. These profitability bonuses were to be calculated on a monthly basis based on a pre-determined formula and distributed to the Plaintiffs "no later than thirty (30) days after the end of the monthly period for which such bonus was earned." Pls. App. 23–25, 35–37; AHKI App. 85–87, 97–99. Plaintiffs could elect, however, to be paid less than the bonus earned in order to maintain reserves for future or anticipated losses, or to maintain an operational reserve. Pls. App. 25–26, 37–38; AHKI App. 87–88, 99–100. Any reserve funds derived from these retained earnings were to be transferred back to Plaintiffs within thirty days of their departure from the company. *Id.*

For the first few years of their employment with AHKI, business was good to Plaintiffs and the Southeast Branches they managed. By the end of 2009, Plaintiffs had together earned over $584,000 in profits, all of which they opted to retain as reserves against future losses. Pls. App. 65–66. And, despite suffering small losses in 2010 and 2011, Plaintiffs still retained reserves in the amount of $502,889.19 as of September 30, 2011. Pls. App. 66; doc. 220, Pls. Reply App. 88–89 (196:4–25, 197:1–3). Unfortunately for Plaintiffs and AHKI, however, things started to go south quickly from there.

In October 2011, AHKI's primary warehouse lender and customer, Bank of America, announced that it was withdrawing from the commercial mortgage market and terminating AHKI's line of credit in the process. Pls. App. 9 ¶ 26; AHKI App. 49 (184:12–16), 154; Weststar App. 36 (78:4–8). Also around this time, AHKI's lending practices became the subject of an investigation

by the Georgia Department of Banking and Finance as well as a HUD audit. Pls. App. 173 (159:4–15); AHKI App. 154 (180:13–16, 181:3–7).

Concerned about the financial health of AHKI following Bank of America's withdrawal from the commercial mortgage market, Plaintiffs sought assurances from AHKI's President Lane Terrell regarding the availability of their accrued bonuses and the security of their positions. Pls. App. 9 ¶¶ 23–24. According to Plaintiffs, these communications occurred both in person and by telephone. *Id.* at 9 ¶ 25. Of particular significance to the present dispute, however, is a phone conversation that Plaintiffs had with Terrell in October 2011, which they recorded. Pls. App. 9 ¶¶ 26–27, 15. During that conversation, Terrell told Plaintiffs that he expected "there [was] going to be a gob of really, really, really, really good opportunities within the next couple months," *id.* at 10 ¶ 30, 15 at approx. 6:12, and that "2012 can be just a bang up year. . .the year to make all the money." *Id.* at 10 ¶ 30, 15 at approx. 32:10. He also reportedly told Plaintiffs that so long as it was able to, AHKI would pay Plaintiffs their bonuses. *Id.* at 168 (117:6–8). Allegedly reassured by Terrell's predictions, Plaintiffs decided to stay at AHKI and to keep their accrued bonuses in reserve. *Id.* at 10 ¶¶ 31–32.

Far from rebounding, however, AHKI closed the Southeast Branches and terminated Plaintiffs' contracts on November 15, 2011. AHKI App. 139–40 (122:9–17). Following the closing, AHKI did not make any bonus payments to Plaintiffs, nor has it done so since. Pls. App. 166 (115:6–8). Moreover, Plaintiffs maintain that due to the abruptness of their termination and the closing of the Southeast Branches, Plaintiffs were unable to retain their employees, causing Plaintiffs to miss out on future earning opportunities. Pls. App. 11 ¶¶ 36–38.

C.    *The Sale of AHKI to Weststar*

As previously stated, Bank of America exited the mortgage business and withdrew its

warehouse line of credit from AHKI in the Fall of 2011. Weststar App. 51 (254:8–15). Due in part to the loss of its primary lender, Terrell began looking to sell AHKI. *Id.* at 41 (175:10–12). To help it locate potential suitors, AHKI hired Jackman Financial, who first connected AHKI with Supreme Lending. *Id.* at 43 (177:1–5). Despite Supreme Lending signing a Letter of Intent, however, the deal did not go through. *Id.* at 44–45 (178:5–7, 179:7–8).[3]

Jackman Financial then connected AHKI with Defendant Weststar. *Id.* at 45 (179:16–18). As Terrell and Jackman Financial were unable to find any other suitors at this time, AHKI and Weststar signed a Letter of Intent on December 27, 2011.[4] *Id.* at 63. The essential terms of the Letter of Intent provided that Weststar would purchase certain assets from AHKI, while AHKI would retain all of its liabilities. *Id.* at 63–64. The Letter of Intent further provided that it created no binding legal obligation and that transactions between the parties would be subject to the subsequent, definitive written agreements and related documentation to be drafted by Weststar. *Id.* at 65–66.

As negotiations between Weststar and AHKI progressed,[5] AHKI's bankruptcy counsel,

---

[3] There is some confusion as to why the deal did not go through. At his deposition, Terrell testified that Supreme Lending's CFO called Terrell to let him know that Supreme Lending was backing out of the deal, *see id.* at 45 (179:7–8), but according to another AHKI officer, Frank Caughron, the deal did not go through because Supreme Lending reduced the price it was willing to pay for AHKI's assets and it did not make sense for AHKI to go through with the deal at the reduced price. *Id.* at 60 (62:7–15).

[4] Sometime prior to signing the Letter of Intent in December 2011, AHKI and Weststar entered into a Correspondent Lending Purchase Agreement, pursuant to which Weststar purchased certain closed loans from AHKI, each for its par value. Docs. 170, Pls. Weststar Br. 14; 185, Weststar Resp. Br. 10.

[5] The primary parties negotiating the sale of AHKI's assets to Weststar were Lane Terrell, Weststar Senior Vice President Ryan Grandi, and Weststar President Kent Weichert. Docs. 185 Weststar Resp. Br. 13; 186, Weststar Resp. App. 103–05, 148–50.

Rakhee Patel, advised AHKI to hire a Chief Reorganization Officer. *Id.* at 48 (221:17–18). AHKI hired John Krugh, an attorney who had previously handled some small legal matters for AHKI and worked as General Counsel for Perry Homes. *Id.* at 69–70 (12:23–24, 14:15–19. Krugh was hired to prepare AHKI for going into Chapter 11 bankruptcy. *Id.* at (16:13–15). In this capacity,  Krugh was partially responsible for deciding which of AHKI's creditors would get paid. *Id.* at 74–75 (61:23–25, 62:1–5). In other words, his primary function was to make sure that AHKI's transactions, with Weststar and any other party, would survive scrutiny by AHKI's creditors during the bankruptcy process. *Id.* at 78 (66:15–20).

In January and February 2012, AHKI and Weststar entered into a pair of Mortgage Loan Services Agreements. *Id.* at 86, 94. Under the terms of these agreements, Weststar agreed to purchase origination services for certain AHKI loans (hereinafter, the "in-process loans") for .50% of the amount of each loan, also known as fifty (50) basis points. *Id.* at 87, 95. The loans Weststar purchased from AHKI were at various stages of the loan origination process.[6] *Id.* at 86, 94, 131 ¶ 8.

In accordance with the January Loan Services Agreement, Weststar collectively paid $127,904.07 directly to First Choice and MTH, both creditors of AHKI. Doc. 165, Weststar Br. 5–6; App. 104–06, 107–109. In accordance with the February Loan Services Agreement, Weststar paid $246,109.46 to Opportunity Bank, another AHKI creditor. Weststar App. 110–112. AHKI did not receive any money from these transactions. *Id.* at 79 (67:16–21).

---

[6] Loan origination is the process by which a lender processes a loan application and generally includes all the steps from taking a loan application to approval or declination of the application. *Id.* at 131 ¶ 6. Loans in the origination process are distinguishable from closed loans in that closed loans are ready for sale, for which funds have been disbursed, and all required documentation has been executed, received, and reviewed. *Id.* at 131 ¶ 7.

Also in February 2012, AHKI and Weststar signed an Asset Purchase Agreement. *Id.* at 113. Under the terms of this agreement, Weststar agreed to purchase from AHKI various furniture, fixtures and equipment, software and IT systems, and the assignment of leases and security deposits for some AHKI locations for their combined book value of $561,012.34. *Id.* at 123–25. Weststar wired payment in this amount to Opportunity Bank on February 17, 2012. *Id.* at 126.

D.     *The Present Lawsuit*

The present lawsuit began on April 11, 2012, when Plaintiffs filed a complaint against AHKI and several of its officers (collectively, the "Individual Defendants"), most notably Lane Terrell, in the state court for Cobb County, Georgia.[7] Doc. 1, Notice of Removal 12. Defendants subsequently removed the case to the District Court for the Northern District of Georgia, which in turn, transferred the case to this Court. Docs. 1, Notice of Removal 1–4; 41, Order Transferring Case.

In their original complaint, Plaintiffs alleged that AHKI and the Individual Defendants unlawfully withheld from Plaintiffs the bonuses Plaintiffs had accrued under the Employment Contracts and misled Plaintiffs into staying with the company to their ultimate detriment. Doc. 1, Complaint ¶¶ 21–36. Based on these allegations, Plaintiffs asserted causes of action for breach of contract, unjust enrichment, conversion, fraud, and negligent misrepresentation. *Id.* ¶¶ 47–98.

On August 16, 2013, Plaintiffs filed an Amended Complaint, which repeats all of Plaintiffs' original allegations and claims against AHKI and the Individual Defendants, but also includes a claim against both AHKI and Weststar for fraudulent transfer under the Texas Uniform Fraudulent

---

[7] With the exception of Individual Defendant Steven Chiou, whose Motion to Dismiss the Court granted on March 19, 2013, *see* Doc. 73, all of the Individual Defendants named in Plaintiffs' original Complaint remain defendants.

Transfer Act ("TUFTA"). Doc. 108, Amended Complaint ¶¶ 108–118. Specifically, Plaintiffs allege: (1) AHKI did not sell, and Weststar did not purchase, AHKI's assets in good faith; (2) Weststar did not pay reasonably equivalent value for AHKI's assets; (3) AHKI sold its assets to Weststar with the intent to defraud its creditors; and (4) Weststar had actual or constructive knowledge of AHKI's fraudulent intent. *Id.*

On April 1, 2014, Plaintiffs and Weststar cross-moved for summary judgment on Plaintiffs' fraudulent transfer claim. Docs. 164; 169. Plaintiffs also moved for summary judgment on their claims against AHKI and Lane Terrell. Doc. 167. All three motions are currently ripe for review.

## II.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law governing a matter determines which facts are material to a case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs*, 919 F.2d 301, 303 (5th Cir. 1990). However, if the non-movant ultimately bears the burden of proof at trial, the summary judgment movant may satisfy its burden by pointing to the mere absence of evidence supporting the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the summary judgment movant has met this burden, the non-movant must "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam) (citing *Celotex*, 477 U.S. at 325).

In determining whether a genuine issue exists for trial, the court will view all of the evidence in the light most favorable to the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000). But the non-movant must produce more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-movant is unable to make such a showing, the court must grant summary judgment. *Little*, 37 F.3d at 1076.

## III.

## ANALYSIS

Plaintiffs move for summary judgment on their breach of contract, conversion, fraud, and negligent misrepresentation claims against AHKI and Terrell, and on their fraudulent transfer claim against AHKI and Weststar. For their part, AHKI, Terrell, and Weststar all urge the Court to deny Plaintiffs' request for summary judgment and, in Weststar's case, to enter summary judgment in its favor instead. The Court addresses each of these requests, in turn, below.

A.    *Plaintiffs' Breach of Contract Claims Against AHKI and Terrell*

Plaintiffs first move for summary judgment on their breach of contract claims against AHKI and Terrell. In order to prevail on a breach of contract claim under Texas law, a plaintiff must prove that: (1) there was a valid contract; (2) plaintiff performed his or her obligations under the contract; (3) defendant breached the contract; and (4) plaintiff suffered damages as a result of defendant's breach. *Smith Int'l, Inc. v. Egle Group, LLC*, 490 F.3d 380, 387 (5th Cir. 2007). Plaintiffs maintain that AHKI and Terrell breached the terms of the Employment Contracts by failing to pay Plaintiffs over $500,000 in bonuses that Plaintiffs had earned during the course of their employment with AHKI, but opted to retain as an operational reserve. Doc. 168, Pls. Br. 14–18. AHKI and Terrell dispute that they breached the Employment Contracts, but argue that even if they did, Plaintiffs are

not entitled to judgment as a matter of law because their breach was excused by Plaintiffs' prior material breach of the Employment Contracts. Doc. 188, AHKI Resp. Br. 5, 11. For the reasons that follow, the Court agrees with Plaintiffs that AHKI breached the terms of the Employment Contracts by failing to pay Plaintiffs their accrued bonuses, but holds that Plaintiffs are not entitled to summary judgment on their breach of contract claim against Terrell, because Plaintiffs have failed to produce any evidence to show that Terrell was a party to the Employment Contracts.

1.      Plaintiffs' Breach of Contract Claim Against AHKI

In this case, the undisputed evidence shows that Plaintiffs Hoffman and Pate-Schnure each entered into a valid, written employment contract with AHKI, pursuant to which Plaintiffs were each eligible to receive a monthly profitability bonus equal to fifty percent (50%) of the net, pre-tax profits of the Southeast Branches, Pls. App. 23–26, 35–38; AHKI App. 85–88, 97–100. Under the undisputed terms of the Employment Contracts, Plaintiffs could elect to have AHKI withhold these bonuses to cover against future losses or as an operational reserve, and that any reserve funds derived from these retained earnings were to be transferred back to Plaintiffs within thirty (30) days of their departure from the company. *Id.* The evidence also shows that as of the date of their termination, Plaintiffs had earned at least $41,000 in accrued bonuses.[8] Pls. App. 144 (208:10–14); AHKI App.

---

[8] AHKI devotes a significant portion of their briefing to arguing that Plaintiffs overstate the amount of bonuses they were owed. AHKI Resp. Br. 7–8. In support of their argument, AHKI point to statements made by Terrell and Ida Alcazar, AHKI's Chief Financial Officer, in their depositions regarding severe losses that the Southeast Branches suffered in October and November 2011. AHKI App. 139–40, 175, 324–37. AHKI argues that these losses significantly diminished the amount of Plaintiffs' reserves, raising material issues of fact as to whether AHKI breached the Employment Contracts and as to whether Plaintiffs suffered any damages as a result. AHKI Resp. Br. 6, 10.

Contrary to AHKI's contention, however, this evidence does not raise a material issue of fact as to whether AHKI breached the terms of the Employment Contracts or as to whether Plaintiffs suffered damages, because Ms. Alcazar elsewhere testified that as of year-end 2011, AHKI owed Plaintiffs $41,000 in accrued bonuses. Pls. App. 144 (208:10–14); AHKI App. 324, 326 (208:10–14, 210:13–17). Rather,

324, 326 (208:10–14, 210:13–17). Finally, the evidence reveals that AHKI never paid Plaintiffs these accrued bonuses. Pls. App. 11 ¶ 39, 166 (115:6–8). Thus, the Court concludes that Plaintiffs have met their burden of showing that there are no material questions of fact as to whether AHKI breached the terms of the Employment Contracts.

Despite these uncontested facts, AHKI argues that Plaintiffs are not entitled to judgment as a matter of law on their breach of contract claim, because the evidence shows that Plaintiffs materially breached the Employment Contracts, excusing AHKI of its duty to perform. AHKI Resp. Br. 11–12 (citing *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004)). Specifically, AHKI contends that Plaintiffs breached Paragraph 9.04 of their respective employment contracts when they failed to pay AHKI for certain loans that Plaintiffs transferred to their new employer following their termination from AHKI in November 2011.[9] *Id.* at 12. The Court need not address the merits of this argument, however, because as Plaintiffs correctly point out in their reply brief, AHKI waived its right to assert Plaintiffs' material breach of the Employment Contracts as an affirmative defense by failing to timely plead it. Doc. 218, Pls. Reply Br. 16.

Under Federal Rule of Civil Procedure 8(c), "when responding to a pleading, a party must, affirmatively state any avoidance or affirmative defense. . . ." Fed. R. Civ. P. 8(c). "[T]he key to determining the sufficiency of pleading an affirmative defense is whether it gives the claimant fair notice of the defense." *In re Snelson*, 305 B.R. 255, 263 (Bkr. N.D. Tex. 2003) (citing *Woodfield v.*

---

such evidence merely goes to the issue of the amount of damages that Plaintiffs suffered.

[9] Paragraph 9.04 of the Employment Contracts provides, in relevant part: "The Employer agrees that any loans in pipeline at time of termination [of the Employment Contract] by either party will be transferred to company of employee choice at the cost of 0.25% of the loan amount within 30 days of termination." Doc. 190, AHKI App. 93, 105.

*Bowman*, 193 F.3d 354, 362 (5th Cir.1999)). Failure to plead an affirmative defense may result in waiver. *McDaniel v. IntegraCare Holdings, Inc.*, 901 F. Supp. 2d 863, 868 (N.D. Tex. 2012).

That said, "technical failure to comply precisely with Rule 8(c) is not fatal" so long as the defendant raised the defense "at a pragmatically sufficient time, and the plaintiff was not prejudiced in its ability to respond," *Lucas v. U.S.*, 807 F.2d 414, 417 (5th Cir. 1986) (citations omitted). "The prejudice inquiry considers whether the plaintiff had sufficient notice to prepare for and contest the defense, and not simply whether the defense, and evidence in support of it, were detrimental to the plaintiff." *McDaniel*, 901 F. Supp. 2d at 868 (citing *Rogers v. McDorman*, 521 F.3d 381, 387 (5th Cir. 2008)).

Here, AHKI raised Plaintiffs' material breach as an affirmative defense in its answer, but failed to specify what provision of their respective employment contracts Plaintiffs breached. Doc. 12, AHKI Answer 4. When Plaintiffs subsequently sought to clarify, in an interrogatory, the facts forming the basis of this defense, AHKI identified a different contractual provision, but made no reference to Paragraph 9.04. Doc. 220, Pls. App. 44, 60–61. Thus, the first Plaintiffs learned of AHKI's intent to raise Plaintiffs' material breach of Paragraph 9.04 as an affirmative defense was in AHKI's response to Plaintiffs' motion for summary judgment. *See* doc. 188, AHKI Resp. Br. 11–13. As a result, Plaintiffs were prevented from conducting discovery on the defense, impairing their ability to contest the defense in their summary judgment briefing. Doc. 218, Pls. Reply Br. 16. Accordingly, the Court finds that AHKI waived its right to rely on Plaintiffs' material breach of Paragraph 9.04 as an affirmative defense to their own breach of the Employment Contracts.

For this reason, and because Plaintiffs have shown that there are no material issues of fact as to whether AHKI breached the Employment Contracts, Plaintiffs are entitled to summary

judgment on the merits of their breach of contract claim. However, because a significant factual dispute remains between the parties regarding the amount of bonuses owed Plaintiffs, the Court cannot award Plaintiffs damages at this time.[10] *See supra* note 9.

2.   Plaintiffs' Breach of Contract Claims Against Terrell

Although the Court concludes that Plaintiffs are entitled to summary judgment on their claim that AHKI breached the Employment Contracts, the Court cannot reach the same conclusion with respect to Plaintiffs' identical claim against Terrell. This is because Plaintiffs have presented no evidence to show that Terrell was a party to the Employment Contracts, as they are necessarily required to do in order to prevail on their breach of contract claim against him. *See Egle Group, LLC,* 490 F.3d at 387. While Terrell signed the Employment Contracts with the Plaintiffs, he did so only in his capacity as the President (i.e., an agent) of AHKI. Pls. App. 33–34; 45–46. As such, he can only be bound by the Employment Contracts if, at the time of contracting, Plaintiffs had no notice that Terrell was acting on behalf of AHKI. Restatement (Third) Of Agency §§ 1.04(2)(b)–(c),

---

[10]As discussed previously, AHKI has offered deposition testimony from Terrell and AHKI's Chief Financial Officer, Ida Alcazar, which if accepted as true, would allow a reasonable juror to conclude that AHKI owes Plaintiffs significantly less than they claim due to severe losses suffered by the Southeast Branches in October and November 2011. *See supra* note 9. Plaintiffs argue that this testimony is not competent summary judgment evidence because Terrell lacked personal knowledge of the Southeast Branches' losses, Ms. Alcazar's testimony is improbable and unsupported by any financial data, and her testimony contradicts that of Terrell. Pls. Reply Br. 9–14. After reviewing Mr. Terrell's and Ms. Alcazar's deposition testimony, however, the Court cannot agree. Although Plaintiffs are correct to point out that both Terrell and Alcazar's deposition testimony regarding the losses suffered by the Southeast Branches is sorely lacking in documentary support and not entirely consistent, the Court concludes that both had personal knowledge about the finances and general performance of the Southeast Branches in October and November 2011 and thus were competent to testify on the subject. *Cf. Potts v. United Parcel Serv.,* No. 3:11-CV-2407-L, 2013 WL 4483080, at *7 (N.D. Tex. Aug. 22, 2013) (finding that party's own deposition testimony was not competent summary judgment evidence where party did not have any personal knowledge of the incidents about which he testified and his testimony was completely unsubstantiated). It is for the jury and not the Court to decide what weight, if any, to give this testimony.

6.01–6.03. Seeing, however, as AHKI was clearly identified on the front pages of the Employment Contracts as a principal party, Plaintiffs had sufficient notice that they were entering into agreements with AHKI and not Lane Terrell. Pls. App. 23, 35; *see also* Pls. App. 7 ¶ 10. Thus, Plaintiffs have failed to meet their burden of showing that Terrell was a party to the Employment Contracts and subject to liability for their breach.

B.    *Plaintiffs' Conversion Claims Against AHKI and Lane Terrell*

Plaintiffs next move for summary judgment on their conversion claims against AHKI and Terrell. Plaintiffs claim that AHKI and Terrell committed conversion by exercising dominion and control over Plaintiffs' bonuses and refusing to return them to Plaintiffs despite Plaintiffs' multiple demands. Doc. 168, Pls. Br. 18–20. In response, AHKI and Terrell argue that Plaintiffs' conversion claims are precluded by the economic loss rule and, if not, that a fact question exists as to whether AHKI owed Plaintiffs any bonuses at the time of their termination in November 2011. AHKI Resp. Br. 14. For the reasons that follow, the Court agrees with AHKI and Terrell that the economic loss rule precludes the Court from granting Plaintiffs' request for summary judgment on their conversion claims.

Conversion is "the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971). To prove conversion, a plaintiff must establish the following four elements:

> (1) plaintiff owned, had legal possession of, or was entitled to possession of the property; (2) defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with plaintiff's rights; (3) plaintiff made a demand for the property; and (4) defendant refused to return the property.

*Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 888 (Tex. App.—Dallas 2009, no pet.).

Under what is known as the economic loss rule, however, a plaintiff may not maintain both a contract and a tort claim against a defendant when the only loss or damage that the plaintiff suffered was economic loss to the subject matter of the contract itself or when the source of the duty that the defendant is alleged to have breached is the parties' contract. *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494–95 (Tex. 1991); *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986); *see also DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 105 (Tex. 1999). In such cases, the plaintiff's action is for breach of contract alone. *DeLanney*, 809 S.W.2d at 494–95.

In this case, Plaintiffs earned monthly profitability bonuses under the Employment Contracts, which they decided to retain, also in accordance with the Employment Contracts. Docs. Pls. App. 7–8; AHKI App. 324, 326 (208:10–14, 210:13–17). The Employment Contracts obligated AHKI to transfer these retained bonuses to Plaintiffs within thirty days of their departure from the company. Pls. Br. 15; Pls. App. 23–26, 35–38; AHKI Resp. Br. 7, AHKI App. 85–88, 97–100. Thus, it is the Employment Contracts, and not any independent legal obligation, that is the source of the duty that AHKI and Terrell are alleged to have breached. Moreover, the only injury that Plaintiffs suffered as a result of Defendants' alleged conversion, an intentional tort, was the economic loss of their retained bonuses—the subject matter of the Employment Contracts. As such, Plaintiffs only claims for their unpaid bonuses are for breach of contract.[11]

---

[11] In an attempt to avoid this conclusion, Plaintiffs rely on *Hart v. Moore*, 952 S.W.2d 90, 97 (Tex. App.—Amarillo 1997, writ denied) to argue that "[a] plaintiff may submit both causes of action [conversion and breach of contract] to the jury and may recover damages on whichever cause leads to the greatest recovery." Pls. Reply Br. 17. Plaintiffs' reliance on *Hart*, however, is misplaced, because in *Hart*,

C.      *Plaintiffs' Fraud Claims Against AHKI and Terrell*

Plaintiffs also move for summary judgment on their fraud claims against AHKI and Terrell.

To prove fraud in Texas, Plaintiffs must show:

> (1) a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the representation was made with the intention that it be acted upon by the other party; (5) the party acted in reliance upon the representation; and (6) the party suffered injury.

*Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 524 (Tex. 1998). Doc. 168, Pls. Br. 20–21.

In this case, Plaintiffs point to three statements made to them by Terrell in a recorded phone conversation as evidence that AHKI and Terrell made material misrepresentations. They are: (1) Terrell's statement, "I think there is going to be a gob of really, really, really, really good opportunities within the next couple months"; (2) Terrell's statement, "I think 2012 can just be a bang up year bang up year . . . the year to make all the money"; and (3) his promise that were it able to, AHKI would pay Plaintiffs their accrued bonuses.[12] Pls. Br. 22. Plaintiffs claim that these statements were

---

unlike in the present case, the plaintiff's conversion claim was based on the defendants' appropriation of property that was not governed by the parties' contract and thus was independent, not duplicative, of plaintiff's claim for breach of contract. *Hart*, 952 S.W.2d at 97.

[12] In their reply brief, Plaintiffs contend that these statements are simply examples of some of Terrell's more egregious misstatements, and not the only statements upon which their fraud claim rests. Pls. Br. 20. However, at no point in their Amended Complaint or summary judgment briefing do Plaintiffs specifically identify other purported misrepresentations made by Terrell, as is their burden under Federal Rule of Civil Procedure Rule 9(b). Fed. R. Civ. P. 9(b). As such, the Court cannot assess the impropriety of these additional misrepresentations. *Cf. In re Receivership Estate of Indian Motorcycle Mfg., Inc.*, 299 B.R. 36, 47 (D. Mass. 2003) ("Although a court may consider a plaintiff's opposition to summary judgment as a de facto amendment to the original complaint, such an amendment will not ward off dismissal where the fraud allegations remain vague") (internal citation omitted).

material, as Terrell made them to reassure Plaintiffs about their future with the company; and false, because barely one month after Terrell made them, AHKI closed the Southeast Branches and terminated Plaintiffs. *Id.* at 22–23. They also contend that AHKI and Terrell knew their representations were false, seeing as Terrell testified at his deposition that, once he learned that AHKI was going to lose its warehouse line of credit with Bank of America, he knew AHKI had "a very short remaining life span." *Id.* at 23–24; Pls. App. 169–70 (118:18–25, 119:1–2). Plaintiffs further draw from the above facts that Defendants intended for Plaintiffs to act upon their misrepresentations, otherwise according to Plaintiffs, why make them in the first place. Pls. Br. 24–25. Finally, Plaintiffs maintain that they relied on Terrell's statements to their detriment, as evidenced by the fact that Plaintiffs decided to stay with the company following their conversation with Terrell, only to be terminated a little over a month later. *Id.* at 25–26; Pls. App. 10 ¶¶ 31–32.

For their part, AHKI and Terrell do not contest that Terrell made these statements, the statements were material and false, Terrell knew the statements were false when he made them, he made them with the intention that they would be acted upon by Plaintiffs, or that Plaintiffs relied upon Terrell's statements to their detriment. *See* AHKI Resp. Br. 15–18. Rather, AHKI and Terrell maintain that Plaintiffs are not entitled to summary judgment on their fraud claim for three reasons: the representations upon which Plaintiffs' claim is based relate to future events and are thus not actionable; Plaintiffs cannot establish justifiable reliance; and there are genuine fact issues regarding Plaintiffs' damages.[13] *Id.* at 16–18. As explained below, the Court agrees with AHKI and Terrell that

---

[13] AHKI and Terrell also contend that Plaintiffs have failed to meet their summary judgment burden because the recorded telephone conversation upon which Plaintiffs rely is not competent summary judgment evidence. AHKI Resp. Br. 15. The Court need not address this contention, however,

there is a genuine issue of material fact as to whether Plaintiffs justifiably relied on Terrell's representations that precludes the Court from granting Plaintiffs' request for summary judgment on their fraud claims. As such, the Court need not address AHKI and Terrell's additional arguments for why Plaintiffs' fraud claims fail.

In order to prove fraud in Texas, plaintiffs must not only establish that they actually relied on a defendant's representations to their detriment, but also that their reliance was justifiable given their "individual characteristics, abilities, and appreciation of [the] facts and circumstances" surrounding the defendant's statements. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010) (internal citations and quotations omitted). Plaintiffs' reliance may not have been justifiable if there were sufficient "red flags" indicating that the defendant's representations were unreliable. *Id.* (holding that plaintiff's decision to purchase certain bonds was unjustifiable given its knowledge that the bond seller had lost its primary source of funding and failed to make a scheduled interest payment, and that the bond's high purchase price reflected a substantial risk that the bonds would not be redeemed for face value).

In this case, Plaintiffs had ample reason to know that, despite Terrell's vague assurances that better times were coming, there was a not insignificant chance that AHKI would go under and that it would be forced to terminate Plaintiffs as a result. For starters, during the same phone conversation that Terrell made the alleged misrepresentations to Plaintiffs, Terrell told Plaintiffs that AHKI's investors were "falling by the wayside" and that he was unsure whether AHKI would be able to find new investors within the next two to three months. Pls. App. 15 at approx. 3:50. He also explained

---

because the Court concludes that, even considering the recorded conversation, there is a genuine issue of material fact as to whether Plaintiffs justifiably relied on Terrell's statements.

to Plaintiffs that Bank of America's withdrawal from the corporate mortgage market, and the potential withdrawals of MetLife and Chase, placed the entire loan origination industry in a perilous position. *Id.* at approx. 4:20. Last, Terrell indicated to Plaintiffs that while he thought the Georgia regulators were going to let AHKI stay in business, he couldn't be sure; and that even if AHKI did survive, he wasn't sure how large a fine the company would have to pay. *Id.* at approx. 24:10. The Court concludes, therefore, that there is a genuine fact issue as to whether Plaintiffs' decision to stay at AHKI based on Terrell's representations was justifiable.

D.      *Plaintiffs' Negligent Representation Claims Against AHKI and Terrell*

Plaintiffs next move for summary judgment on their negligent misrepresentation claims against AHKI and Terrell. To prove that AHKI and Terrell are liable for negligent misrepresentation, Plaintiffs must show: (1) AHKI and Terrell made representations in the course of their business, or in a transaction in which they had a pecuniary interest; (2) AHKI and Terrell supplied false information for the guidance of others in their business; (3) AHKI and Terrell did not exercise reasonable care or competence in obtaining or communicating the information; and (4) Plaintiffs suffered pecuniary loss by justifiably relying on the misrepresentations. *Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

Plaintiffs maintain that they are entitled to summary judgment on their negligent misrepresentation claims for the same reasons that they are entitled to summary judgment on their fraud claims. Pls. Br. 27–28. As explained above, however, Plaintiffs are not entitled to summary judgment on their fraud claims, because there is a genuine issue of material fact as to whether Plaintiffs justifiably relied on Terrell's representations in deciding to stay at AHKI after Bank of America's withdrawal from the corporate mortgage market. Thus, Plaintiffs are not entitled to

summary judgment on their negligent misrepresentation claims either. *See Grant Thornton LLP*, 314 S.W.3d at 923.

E.     *Plaintiffs' Fraudulent Transfer Claim Against AHKI and Weststar*

Finally, both Plaintiffs and Weststar move for summary judgment on Plaintiffs' fraudulent transfer claim. Under Section 24.005 of the TUFTA, a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Comm. Code § 24.005(a). To the extent the transfer is found fraudulent, the creditor may recover the value of the assets transferred from the transferee unless that person took the assets in good faith and for a reasonably equivalent value. *Id.* § 24.009(a)–(b).

Plaintiffs maintain that they are entitled to summary judgment against both AHKI and Weststar on their fraudulent transfer claim, because "the evidence of AHKI's actual intent to defraud its creditors is overwhelming and uncontested," and because "AHKI is unable to show, as a matter of law, that it received reasonably equivalent value in transferring its assets to Weststar." Pls. Br. 28.

Both AHKI and Weststar dispute Plaintiffs' contention and urge the Court to deny Plaintiffs' request for summary judgment. Doc. 185, Weststar Resp. Br. 5; AHKI Resp. Br. 20–23. But whereas AHKI merely argues that Plaintiffs' request should be denied because there are genuine issues of material fact as to whether (1) a debt was owed to Plaintiffs (i.e., whether Plaintiffs were, in fact,

creditors of AHKI), (2) the transfers were made with the actual intent to hinder, delay, or defraud Plaintiffs, and (3) AHKI received reasonably equivalent value from Weststar for its assets, *see* AHKI Resp. Br. 18–21, Weststar claims that it is entitled to judgment as a matter of law, because the undisputed evidence shows that it purchased AHKI's assets for reasonably equivalent value and in good faith. Weststar Br. 5–6.

For the reasons that follow, the Court agrees with AHKI that there are genuine issues of material fact as to whether the transfers were made with the actual intent to hinder, delay, or defraud Plaintiffs and whether AHKI received reasonably equivalent value from Weststar for its assets. These issues preclude the Court from granting summary judgment for either Plaintiffs or Weststar.

1.      Actual Intent to Defraud

As stated above, one of the ways Plaintiffs may prevail on their fraudulent transfer claim is to show that AHKI had the actual intent to defraud them. Tex. Bus. & Comm. Code 24.005(a). As evidence that AHKI possessed such fraudulent intent, Plaintiffs point to statements made by AHKI's Chief Restructuring Officer, John Krugh, during his deposition, which Plaintiffs argue amount to an admission of fraud on the part of AHKI. Pls. Br. 29–30; Pls. App. 154 (101:9–18), 159 (116:14–20). They also present evidence of several "badges of fraud" that they maintain is both undisputed and so overwhelming as to entitle them to judgment as a matter of law. Pls. Br. 30–34. AHKI and Terrell dispute that AHKI had the actual intent to defraud Plaintiffs and maintain that material questions of fact preclude the Court from granting summary judgment for Plaintiffs on this issue. AHKI Resp. Br. 22–23.

To aid plaintiffs in proving fraudulent intent on the part of AHKI, the TUFTA includes a non-exhaustive list of eleven "badges of fraud" from which such intent may be inferred. *See* Tex. Bus.

& Comm. Code § 24.005(b). However, plaintiffs may also prove fraudulent intent through the use

of direct evidence. *In re SMTC Mfg. of Texas*, 421 B.R. 251, 299 (Bankr. W.D. Tex. 2009). Thus,

although the issue of fraudulent intent is generally a fact question for the fact-finder to decide, *see*

*Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex.1986); *Coleman Cattle Co., Inc. v.*

*Carpentier*, 10 S.W.3d 430, 433 (Tex. App.—Beaumont 2000); *Hahn v. Love*, 321 S.W.3d 517,

525–26 (Tex. App.—Houston [1st Dist.] 2009, pet. denied), summary judgment may still be

appropriate in rare cases, such as "when the defendant admits the fraud, the conveyance instrument

is fraudulent on its face, the defendant retains an interest in the property inconsistent with the

conveyance alleged, or the evidence indisputably reveals that the transfer was made [with] the intent

to defraud." *See BMG Music v. Martinez*, 74 F.3d 87, 90 (5th Cir. 1996). As explained in detail

below, however, this is not one of those cases.

First, and contrary to Plaintiffs' contention, AHKI does not admit that it transferred its assets

to Weststar to avoid having to pay Plaintiffs their bonuses. Although it is true, as Plaintiffs point out,

that John Krugh, AHKI's Chief Restructuring Officer, acknowledged at his deposition that AHKI

intended to transfer all of its assets to Weststar before filing for bankruptcy and that it was important

to AHKI to close its transaction with Weststar before its other creditors became fully aware of its

poor financial condition, *see* Pls. App. 154 (101:12–18), 159 (116:9–14), such an acknowledgment

does not necessarily amount to an admission of fraud. While a desire to defraud its creditors,

including Plaintiffs, is one possible explanation for AHKI's decision to quickly transfer all of its assets

to Weststar, AHKI could also have believed, quite benignly, that by selling its assets to Weststar

before its creditors became fully aware of its financial condition, AHKI could get a higher price for

its assets, allowing it to more efficiently pay off its creditors and avoid bankruptcy. In fact, there is

evidence to suggest that this is exactly what AHKI intended when it arranged to sell its assets to Weststar.[14]

Second, Plaintiffs do not contend, nor is there any evidence to suggest, that any of the conveyance instruments in this case were fraudulent on their face.

Third, Plaintiffs have presented insufficient evidence from which to conclude that AHKI or its officers retained an interest in AHKI's assets following their transfer to Weststar. While it may be true, as Plaintiffs point out, that Weststar offered employment to several of AHKI's senior officers following the transaction, Pls. App. 161, 188–90, that between them, these officers owned a significant portion of AHKI's stock, *id.* at 17–18, and that one of Terrell's duties for Weststar was to assist Weststar with any issue related to the assets purchased from AHKI, *id.* at 174–75, 189, Plaintiffs cite no legal authority to support their contention that these circumstances were sufficient to give AHKI's officers a controlling interest in AHKI's assets following their sale to Weststar.

Finally, although Plaintiffs have presented uncontested evidence of several badges of fraud—AHKI was threatened with suit before it made the transfer, *id.* at 56–58, AHKI transferred substantially all of its assets to Weststar, *id.* at 176–77 (234:10–25, 235:1–11), AHKI was insolvent before it transferred its assets to Weststar, *id.* at 135 (190:6–10)—such evidence is not so overwhelming as to rule out the possibility that a reasonable juror could find that AHKI lacked the intent to defraud Plaintiffs. This is especially true in light of the fact that AHKI has presented

---

[14] For example, wire transfer records appended to Weststar's Motion for Summary Judgment show that AHKI used all of the proceeds from the sale of its assets to Weststar to pay several of its creditors. Doc. 166, Weststar App. 110–112, 123–25. Also, AHKI's very purpose in hiring Mr. Krugh as its Chief Restructuring Officer was to ensure that AHKI's transactions, with Weststar and any other party, would survive scrutiny by AHKI's creditors during the bankruptcy process. *Id.* at 78 (66:15–20).

evidence that tends to support an alternative explanation for why AHKI transferred all of its assets to Weststar. *Cf. Martinez*, 74 F.3d at 90 (granting summary judgment for plaintiff where defendants admitted to numerous facts that constituted badges of fraud and defendants' only evidence to support their theory of intent was conclusory in nature).

For these reasons, the Court cannot conclude that, as a matter of law, AHKI had the actual intent to defraud Plaintiffs when it arranged to sell its assets to Weststar.

2.     Reasonably Equivalent Value

Plaintiffs may also prevail on their fraudulent transfer claim if they can prove that AHKI did not receive reasonably equivalent value from Weststar for its assets and either was engaged in a business or a transaction for which its remaining assets were unreasonably small, or intended to incur debts beyond its ability to pay. Tex. Bus. & Comm. Code 24.005(a). If, on the other hand, Weststar can conclusively show that it paid reasonably equivalent value for AHKI's assets, it may be entitled to judgment based on its bona fide purchaser defense. *Id.* § 24.009(a).

The TUFTA defines "reasonably equivalent value" as including, "without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." *Id.* § 24.004(d). To receive reasonably equivalent value, this much is clear:  a debtor need not collect a dollar-for-dollar equivalent. *Matter of Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125–26 (5th Cir. 1993) (citing *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201, 203 (5th Cir. 1980)). Beyond this, however, the issue of whether a debtor received reasonably equivalent value is "fact-intensive," and thus frequently not suitable for resolution through summary judgment. *Matter of Besing*, 981 F.2d 1488, 1494 (5th Cir. 1993).

In this case, AHKI transferred three different sets of assets to Weststar. First, pursuant to an

Asset Purchase Agreement, AHKI sold Weststar certain "hard assets," including its leases, office equipment, software, and the like, for their book value. Weststar App. 115, 125–27. Second, pursuant to two Mortgage Loan Services Agreements, AHKI sold Weststar certain in-process loans for .50% of the amount of each loan, also known as fifty (50) basis points. *Id.* at 86–87, 95–96. Finally, pursuant to a Correspondent Lending Purchase Agreement ("CLPA"), AHKI sold Weststar certain closed loans, each for its par value.[15] Doc. 170, Pls. Weststar Br. 14; Weststar Resp. Br. 7, 15–16. As explained below, the parties vigorously dispute whether the amounts paid for each of these assets was reasonably equivalent value, thus precluding the Court from granting summary judgment for either.

<u>a.</u>      <u>Hard Assets</u>

As stated above, Plaintiffs argue that book value was not reasonably equivalent value for the hard assets that AHKI sold Weststar. Their only support for this claim, however, is a decision from this district, in which the court held that a valuation based on the books of a company that had already been convicted on thirteen counts of fraud for its involvement in a Ponzi scheme was inherently unreliable. Pls. Weststar Br. 9 (citing *Janvey v. Alguire*, 3:09-CV-0724-N, 2013 WL 2451738, at *8 (N.D. Tex. Jan. 22, 2013)). AHKI, by contrast, has never been convicted of fraud or any other illegal business practices and Plaintiffs have come forward with no evidence to suggest that its books were unreliable. As such, the Court is not prepared to hold that book value was an

---

[15] Plaintiffs also contend that Weststar did not pay reasonably equivalent value for AHKI's future production, by which they mean AHKI's employees. Pls. Weststar Br. 10. However, as Weststar points out, Weststar could not and did not require any of AHKI's employees to become employees of Weststar. Rather, Weststar merely offered employees jobs, which they could either accept or reject. Weststar Br. 10; Weststar App. 81 (87:1–3), 186 (112:11–16). As such, Plaintiffs claim is wholly without merit.

unreasonable amount for Weststar to pay for AHKI's hard assets.

That being said, the Court is also not prepared to hold, as Weststar urges, that book value was a *per se* reasonable price for Weststar to pay for AHKI's assets, because like Plaintiffs, Weststar has failed to provide the Court with legal authority to support such a conclusion. While the cases that Weststar cites in its briefing support the position that book value *may* be probative of market value, they do not support the position that book value is *necessarily* or *always* reasonable. *See In re White*, 429 B.R. 201, 217 (Bankr. S.D. Tex. 2010); *Sears Roebuck & Co. v. Dallas Cent. Appraisal Dist.*, 53 S.W.3d 382, 286 (Tex. App.—Dallas, 2000 pet denied). Rather, the Court holds that the issue of whether book value was a reasonable price to pay for AHKI's hard assets is one of fact about which reasonable minds could differ, and thus a question properly reserved for the fact-finder to decide.

<u>b.</u> <u>In-Process Loans</u>

Plaintiffs also contend that the undisputed evidence shows that fifty (50) basis points was not a reasonable amount for Weststar to pay for AHKI's in-process loans, because the price did not reflect the additional revenue that each in-process loan would generate when closed. Pls. Weststar Br. 13–14. Plaintiffs base this contention on their own experience in the mortgage loan origination industry and the opinion of their industry expert, Anthony Schmeck. Pls. App. 124–25, 243–44 (205:21–25, 206:1–8), 246 (145:14–25).

In response, and in support of their own request for summary judgment, Weststar argues that both Plaintiffs' and Mr. Schmeck's opinions as to reasonably equivalent value are unreliable because they are based on the mistaken assumption that each of the in-process loans purchased by Weststar would eventually close when, in reality, such an eventuality could not be assured. Weststar Resp. Br.

-26-

14–15; Weststar App. 149 ¶ 12. Moreover, Weststar presents evidence of its own to suggest that fifty (50) basis points was a reasonable price for the in-process loans, including statements made by Terrell, John Krugh, Ryan Grandi, and John Weichert—all of whom found the price paid by Weststar reasonable in light of their collective experience, industry standards, and the state of the loans originated by AHKI[16]—as well as Plaintiffs' own agreement, in the Employment Contracts, to pay just twenty-five (25) basis points for any in-process loans existing at the time of their termination. Weststar App. 51–52 (253:14–25, 253:1–6), 77 (67:1–15), 105 ¶¶ 16–19, 149–50 ¶¶ 10–14, 222, 234. Weststar argues that by agreeing to this price, Plaintiffs have tacitly admitted that this price was reasonable. Weststar Resp. Br. 13–14.

Having reviewed this evidence, the Court concludes that Weststar's evidence is more than sufficient to raise a genuine issue of fact as to whether fifty (50) basis points was within the range of values for which AHKI would have sold the assets in an arm's length transaction. *See* Tex. Bus. & Comm. Code § 24.004. However, without making numerous credibility determinations, the Court cannot conclude that it is so overwhelming as to place the issue beyond reasonable dispute.

<u>c.</u>    <u>Closed Loans</u>

Finally, Plaintiffs claim that par value was an unreasonably low price to pay for the closed loans that Weststar purchased from AHKI pursuant to the CLPA. Pls. Weststar Br. 14. Plaintiffs offer two main pieces of evidence in support of this claim. First, Plaintiffs submit deposition testimony

---

[16] In its response in opposition to Plaintiffs' Motion for Summary Judgment Against AHKI and Terrell, AHKI similarly points to statements made by Terrell and Grandi concerning the uncertain value of the in-process loan applications, volatility in the market, and industry standards as evidence that the price was reasonable. AHKI Resp. Br. 23; AHKI Resp. App. 172–173 (253:16–25, 254:1–6)), 263–64 (25:18–25, 26:1–12).

from Weststar's then Vice President of Correspondent Lending, Matt Teskey, that he thought par value was "an odd price to see" for the closed loans, indicating to him that something might be "afoul" with the transaction. *Id.* (citing Pls. Weststar App. 239). Second, Plaintiffs cite testimony from the deposition of Ida Alacazar, who stated that AHKI did not receive enough money from the sale of its closed loans to cover its obligations. *Id.* at 15 (citing Pls. Weststar App. 133). Even if this testimony were uncontested (it is not)[17], however, Plaintiffs provide no legal authority to support their claim that such testimony, standing alone, is sufficient to establish that par value was an unreasonable price for the closed loans as a matter of law. As such, the Court concludes that the issue of whether par value was reasonably equivalent value for the closed loans is an issue of fact properly left for a jury to decide.

## IV.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' Motion for Summary Judgment Against AHKI and Lane Terrell, **DENIES** Plaintiffs' Motion for Summary Judgment Against Weststar, and **DENIES** Weststar's Motion for Summary Judgment Against Plaintiffs.

---

[17] In its response brief, Weststar argues that Plaintiffs take Mr. Teskey's remarks out of context. Weststar Resp. Br. 16. According to Weststar, Mr. Teskey was concerned not with the fact that the price was too low, but with the fact that it was "too round." *Id.* (citing Weststar Resp. App. 243). Weststar also disputes the relevancy of Ms. Alcazar's testimony regarding AHKI's inability to meet its obligations with the money received from the sale of its closed loans, as it is routine for companies facing bankruptcy to receive less for their assets than they owe to their creditors. *Id.* at 17.

SO ORDERED.

SIGNED:  December 22, 2014.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE